FILED

13 JUL 16 PM 3:47

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

BY ⟨signature⟩ DEPUTY

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOSE PABLO MALDONADO,<br><br>    Petitioner,<br><br>v.<br><br>J. TIM OCHOA, WARDEN,<br><br>    Respondent. | Case No. 12cv857-BEN(KSC)<br><br>REPORT AND RECOMMENDATION DENYING PETITION FOR WRIT OF HABEAS CORPUS |

## I. INTRODUCTION

Petitioner, Jose Pablo Maldonado ("Petitioner"), a state prisoner, represented by counsel, has filed a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254. On August 6, 2012, Respondent J. Tim Ochoa ("Respondent") filed an Answer to the Petition. On September 15, 2012, Petitioner filed a Traverse to Respondent's Answer.

On December 18, 2009, Petitioner was convicted by a jury in San Diego Superior Court Case No. SCD218059 of

three counts of lewd acts upon a child under the age of fourteen. [Cal. Penal Code 288(a)]. (Doc. No. 9-12, Lodgment No. 2 at 659-662.) Petitioner contends there was insufficient evidence that he committed lewd acts upon the victim and the state appellate court's opinion to affirm the trial court's decision was an unreasonable application of clearly established federal law. (Doc. No. 1, Pet. at 6.)

The Court has considered the Petition, Respondent's Answer, Petitioner's Traverse, and all the supporting documents submitted by the parties. Based upon the documents and evidence presented in this case, and for the reasons set forth below, the Court RECOMMENDS that the Petition be DENIED.

**II.     FACTUAL BACKGROUND**

The following statement is taken from the California Court of Appeal's unpublished opinion in People v. Jose Pablo Maldonado, No. D056725, slip op. (Cal. Ct. App. Mar. 30, 2011). (Doc. No. 9-19, Lodgment No. 6.) This Court gives deference to state court findings of fact and presumes them to be correct. Tilcock v. Budge, 538 F. 3d 1138, 1141 (9th Cir. 2008). Petitioner may rebut the presumption of correctness, but only by clear and convincing evidence. Id.; See also 28 U.S.C. § 2254(e)(1). The facts as substantially found by the state appellate court are as follows:

In late 2004, Petitioner began dating the mother (Mother) of the victim (Child), whom at the time was five

years old. The last time the Child saw her biological father was around July 2004 because her parents had separated and were seeking a divorce. In early 2005, Child learned about the relationship between Petitioner and Mother. In April 2007, Petitioner, Mother, and Child (now age seven) began living together. During this time, Child and Petitioner developed a close, father-daughter relationship.

While Mother, Child, and Petitioner were living together, Mother would occasionally go out for coffee at night with her friends, and Child would either be left at Mother's parents' house or at home alone with Petitioner. The molestations occurred during these outings. On April 21, 2008, Mother gave birth to Petitioner's daughter.

On August 14, 2008, Child (now age nine) first disclosed the molestation to her mother. According to the Mother, that evening Child got into trouble with Petitioner for throwing away a donut. Child, upset and crying after being scolded, went upstairs to seek comfort from Mother. Mother told Child that Petitioner was right, and that she should go to her room and calm down. About fifteen minutes later, Child was crying and acting "hysterical," and came downstairs where Mother and Petitioner were sitting on the couch. While "trying to get a hold of herself" Child professed "she could not keep secrets anymore" and that she was not mad about the donut but "something else." Child confessed to Mother that "some-

thing had happened" between Petitioner and herself "a long time ago." Child mentioned it involved "inappropriate touching" and "massaging." Mother tried to get Child to explain "what was going on" but Child was crying and "could not get anything out."

At this time, Petitioner questioned Child by asking questions. Petitioner informed Child that "she needed to be sure of what she was saying because . . . these were serious accusations" and "people go to jail for these types of things." Petitioner inquired whether Child was talking about the "shower incident when Mother was at coffee." Child replied, "no, that wasn't it," and again while still crying, "brought up the inappropriate touching."

At this point, Mother sent Petitioner upstairs to tend to their baby who had started crying. Mother continued talking to Child, trying to calm her down and rocking her. Mother asked for more detail about Child's accusations. After child calmed down, Child told Mother that she touched Petitioner's "girl parts" (referring to his penis) and that he put his finger in her "girl parts" (referring to her vagina). To show Mother how she touched Petitioner, Child "put both hands in a fist, . . . placed them over each other" and "moved them up and down." Child said "gooey stuff" came out of Petitioner's "girl part." Child told Mother the incidents occurred "a long time ago" when
/ / /
/ / /

she was about six or seven years old; that "she was uncomfortable with it"; and that she did not want to keep a secret anymore.

After Child went back to her bedroom, Mother questioned Petitioner about the accusations. Petitioner said the accusations were ridiculous and that he had never done those things. Mother requested that Petitioner explain what happened with the shower incident. Petitioner claimed that one night when Mother was out for coffee, Child had been in their room watching television. Petitioner submitted that when he got out of the shower Child had seen him naked. Mother asked why she had not heard about this before and Petitioner stated that he did not want to get Child in trouble for being in their room. He said that he handled the situation by explaining to Child not to be in their room. Petitioner also stated that Child had told him that she and her cousin had seen pornography at Mother's parents' house. Petitioner further clarified that he had not told Mother about the pornography because Petitioner assumed Mother's father had handled it.

The next morning, Mother and Petitioner agreed to take Child to the hospital to make a report. Before going to the hospital, they told Child that she needed to be sure of what she was saying because they were serious allegations. They explained that she needed to tell the truth and that "kids can get taken away from their parents about these types of things." They told her they "loved her and . . . were behind her 100 percent." Child told

Mother that "she wasn't sure if this was happening or she was dreaming it." Child expressed to Mother that she wished her biological father had never left and that "she wanted [him] back in the picture." Child also asserted that she had a dream the night before about four boys coming out of a shower or pool, "towel drying and they were naked." Mother confronted Child about seeing sexually explicit material on her grandfather's computer. Child told Mother that when she was with her teenage cousin, she had seen a boy peeing into a girl's mouth and something about a man and woman touching each other's genitals.

On August 15, 2008, during the interviews at the hospital, Child spoke about the molestation to physician's assistant Cyril Thomas ("Thomas"), police officer Paul Harris, psychologist Karen Olmscheid-Koermer, and protective service worker India Hope. When Thomas asked Child why she was there, Child declared she "could not keep the secret anymore." Child further stated that when she had nightmares she went to her mother's room but on a few occasions her mother was not there and Petitioner would ask her to massage his private parts. Thomas advised Mother that he was going to call social services to report the disclosure. Upon returning, Mother (in the presence of Child) told Thomas that the incident could have been a dream and the Child then said to Thomas "I'm not quite sure this happened."
/ / /
/ / /

Child communicated to Officer Harris that Petitioner "made her massage on his private parts" and that the last time this occurred was about two years ago.

Child explained to psychologist Olmscheid-Koermer that she was there because "she wanted to talk about things that were troubling her that she hadn't mentioned before." Child confessed that "she was very uncomfortable with things that were happening with her mother's boyfriend." Child explained that when Petitioner would get out of the shower, he would ask her to touch his genitals and massage them, and he would touch and massage her genitals. Child said the incidents happened on more than one occasion and that she did not "want this to go on anymore." At the end of Child's conversation Child told Dr. Olmscheid-Koermer that she sometimes wondered if it really happened or if she was dreaming it. However, she added that "she was certain it was not a dream" and that "she knew she was not dreaming."

Child told protective service worker Hope that she had touched Petitioner's "girl parts" on two different occasions and that Petitioner had touched her "girl parts." Child explained that the incidents had occurred when she was seven or eight years old when her mother was at a friend's house. Child said one incident occurred when Petitioner got out of the shower when she was in their bedroom and the other was when she had gotten into bed with him. Petitioner had requested Child to keep it secret so that Mother would not find out. (Doc. No. 9-19 at 2-7.)

### Videotaped Forensic Interview

On August 22, 2008, forensic interviewer Marisol Olguin conducted a videotaped interview with Child at Rady's Children Hospital. When Olguin asked child why she had come to talk to her, Child answered, 'Because something, we got in a little situation with my dad.' Child elaborated, '[M]y mom goes out to meetings at night . . .
. . .
one night I snuck into . . . my mom and dad's room.
. . .
I don't remember him getting out of the shower and all that. I just remember him telling me to massage his – his parts and – and I did it, but now I really don't like what I said. . . .
. . .
And what I did. . . .
. . .
I just really remember that and . . .
. . .
then he doing it to me . . . .' When asked to tell more about the massaging, Child stated, "I just like massaged his parts and now I just don't like it now. . . .
. . .
And I didn't like keeping it a secret and I heard – and I thought he said – well, I'm not sure if this is true or if I'm dreaming, but to me, I'm just thinking it's real. But I'm scared because everything else he does to me is fun.' Child stated she remembered two times when she massaged [Petitioner's] 'parts,' and thought the incidents happened about one year ago when she was seven years old.

Child also stated that once or twice [Petitioner] massaged her with his hands in her 'girl parts,' where she 'go[es] to the bathroom.' She could not remember if this happened on top of or under her pajamas, and did not know if he was massaging her on the outside or inside of her 'girl part.'

During further questioning, Child stated that when she massaged his 'girl parts' he was not wearing any clothes; he told her that her mother did it with him; the first time he showed her how to do it; she used her hands during the massages; his 'girl part' where he 'goes number one . . . looks like a stick'; 'this gooey stuff' that looked white and 'kind of grayish' would come out; and [Petitioner] told her that

she should not tell anyone because her mother would yell and get mad.

During the interview Child repeated her statement questioning whether the incidents actually occurred, stating: 'I just don't know if this is real or not . . .

. . .

cause if it's a dream, I didn't want to get lying for dreaming this.' Towards the end of the interview she stated she wanted to see [Petitioner] again because she missed him, and she asked Olguin, 'do you think if this is real . . . I can't see him again? Or if it's a dream, I still can't see him?'

(Doc. No. 9-19, Lodgment No. 6 at 7-8.)

**Trial Testimony**

At trial, Mother testified that during the initial disclosure, Child had mentioned on two different occasions whether the incident "may have been a dream." (Once in the living room and another when Mother was rocking Child.) Mother claimed that Child had made this statement without prompting from Mother or Petitioner. Mother acknowledged the inconsistency in her testimony because during the preliminary hearing she had testified that the first time Child mentioned the idea of it being a dream was the morning after disclosure. Mother testified that in reviewing the notes she had written from the next evening after the disclosure she had remembered Child mentioning the dream scenario. (Doc. No. 9-19, Lodgment No. 6 at 3-4.)

Protective service worker Hope testified that throughout the interview, Child repeatedly mentioned that she could not remember if what happened to her was a dream or if it was real. When Hope investigated why Child thought it might be a dream, Child explained "she [over]heard her

9

12cv857

mother and [Petitioner] talking about the situation, and she heard [Petitioner] make the statement that she must have been dreaming because he would not have done something like that." Child expressed that she wanted to see Petitioner and did not want anything bad to happen to him, but she did not want him to "touch [her] girl parts anymore." (Doc. 9-19, Lodgment No. 6 at 6-7.)

At trial, Child's (now 10 years old) testimony was substantially consistent with her previous disclosures. She testified: "When my mother goes with her friend, I went over to her room and [Petitioner] touched me in the private parts. . . .

. . .

I did it too. . . .

. . .

Touched him . . .

. . .

[I]n his private parts." Child elaborated that she touched his private parts (the part of his body he uses to go to the bathroom) and described how his private part felt, "[s]oft." Child explained that when she touched his private part "[s]ome white stuff" came out that looked like "cream". Child did not know if the touching took place while Petitioner was clothed or naked. To demonstrate the touching, Child took her hands and made loops "between her thumb and forefinger on both hands" and "made her right hand go up and down about six inches." Child indicated that he also had touched her private parts (the part of her body

12cv857

she uses to go to the bathroom) with his hand. Child described how the touching did not hurt but was unaware if the touching took place over or under her clothes.

During cross-examination, defense counsel asked Child whether she was concerned about this being a dream during her initial disclosure. Child answered defense counsel's question by replying "[a] little bit." Defense counsel then asked whether she was still concerned that it might have been a dream and Child responded, "[n]ot as much." When Child was further asked if she still had it "in the back of [her] head that it might have been a dream," she said "[y]es." However, on redirect examination, Child acknowledged, "I don't think it was a dream. . . . . . . [b]ecause it was real." Child proclaimed she knew it was real because of her recollection of her mother coming home and tucking her in after the molestations had occurred. When Child was asked about the dream about the naked boys, Child replied that she was positive that was a dream and that it had only happened one time. (Lodgment No. 6 at 9-10.)

***Defense***

Defense counsel called upon numerous family members and friends to testify about Petitioner's character. Defense counsel also called upon psychiatric social worker James Fay to testify about Child's lack of trauma from being molested. On cross-examination, Fay acknowledged that some children exhibit little to no psychological distress

from being sexually abused and that Child's statements were consistent with the statements she made during the forensic interview. (Doc. No. 9-19, Lodgment No. 6 at 10-11.)

**III. <u>PROCEDURAL BACKGROUND</u>**

On December 7, 2009, the San Diego County District Attorney filed an Amended Information, Case No. SCD218059, including three felony counts of lewd acts upon a child under age 14, in violation of California Penal Code Section 288(a), with allegations of substantial sexual conduct, within the meaning of California Penal Code Section 1203.066(a)(8). (Doc. No. 9-4, Lodgment No. 1, Clk's Tr. Augment at 1-3.) On December 18, 2009, a jury found Petitioner guilty on all three counts. (Doc. No. 9-12, Lodgment No. 2 at 659-662.) The jury also found true allegations of substantial sexual conduct on all three counts. <u>Id.</u> The judge sentenced Petitioner to a middle term of six years on each count with Counts II and III to run concurrent to Count I, for a total term of six years. (Doc. No. 9-13, Lodgment 2 at 1034.)

On June 30, 2010, Petitioner filed an appeal in the California Court of Appeal. (Doc. No. 9-16, Lodgment 3 at 1.) On March 30, 2011, in an unpublished opinion, the California Court of Appeal affirmed the judgment. (Doc. No. 9-19, Lodgment 6 at 1.) On April 11, 2011, Petitioner filed a Petition for Review in the California Supreme Court. (Doc. No. 9-20, Lodgment 7 at 1.) On June 8, 2011, the Petition was denied without opinion. (Doc. No. 9-21, Lodgment 8 at 1.)

On April 6, 2012, Petitioner, proceeding with counsel, filed a Petition for Writ of Habeas Corpus in this Court. (Doc. No. 1, Pet. at 1.) On August 6, 2012, Respondent filed an Answer to the Petition. (Doc. No. 8.) On September 5, 2012, Petitioner filed a Traverse to Respondent's Answer. (Doc. No. 10.)

## IV. **STANDARD OF REVIEW**

This Petition is governed by Title 28, United States Code, Section 2254, as amended by the 1996 Antiterrorism and Effective Death Penalty Act ("AEDPA"). Section 2254(a) sets forth the following scope of review for federal habeas corpus claims:

> The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treatises of the United States. 28 U.S.C. § 2254(a).

As amended, 28 U.S.C. § 2254(d) reads:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. 28 U.S.C. § 2254(d)(1-2).

/ / /

To obtain federal habeas relief, Petitioner must satisfy either Section 2254(d)(1) or Section 2254(d)(2). See Williams v. Taylor, 529 U.S. 362, 399, 403; 120 S. Ct. 1495 (2000). Under Section 2254(d)(1), "a state court decision is 'contrary to our clearly established precedent if the state court applies a rule that contradicts the governing law set forth in our cases' or 'if the state court confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent.'" Lockyer v. Andrade, 538 U.S. 63, 73; 123 S. Ct. 1166 (2003). Under Section 2254(d)(2), "a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Lockyer, 538 U.S. at 75. The Supreme Court has clarified that even an erroneous or incorrect state court application of clearly established law is insufficient for a habeas grant, unless the state court's application was "objectively unreasonable." Id.

When there is no reasoned decision from the state's highest court, the Court "looks through" to the underlying appellate court decision. Ylst v. Nunnemaker, 501 U.S. 797, 801-06; 111 S. Ct. 2590 (1991). If the dispositive state court order does not provide any reasoning to support its decision, federal habeas courts must conduct an independent review of the record to determine whether the state court's decision is contrary to, or an unreasonable application of,

clearly established Supreme Court law. <u>Allen v. Ornoski</u>, 435 F.3d 946, 955 (9th Cir. 2006). A state court need not cite Supreme Court precedent when resolving a habeas corpus claim. <u>Early v. Packer</u>, 537 U.S. 3, 8; 123 S. Ct. 362 (2002). Absent citations to Supreme Court precedent, habeas relief is not merited if the state court decision neither contradicts the reasoning nor the result of Supreme Court holdings. <u>Id.</u>

## V.     **DISCUSSION**

Petitioner argues that there was insufficient evidence to support his convictions. In support of this claim, Petitioner alleges that the prosecution failed to produce evidence, beyond a reasonable doubt, that Petitioner committed lewd acts against the victim. Petitioner contends the uncertainty shrouding the victim's accusations, the evidence of the victim's other dream regarding sexually explicit subjects, and the victim's need for additional attention show a totality of circumstances that indicate that the allegations against Petitioner were not proven beyond a reasonable doubt. (Doc. No. 1, Pet. at 6; Doc. No. 10, Traverse at 6-7.)

The Due Process Clause of the Fifth Amendment, applied to the states by way of the Fourteenth Amendment, burdens the state in a criminal case to prove every fact necessary to constitute the crime with which the defendant is charged beyond a reasonable doubt. <u>Jackson</u>, 443 U.S. 307, 317-318, 99 S. Ct. 2781 (1979) (<u>citing</u> <u>In Re Winship</u>, 397 U.S. 358, 364, 90 S. Ct. 1068 (1970)).

This Court must look at the evidence in the light most favorable to the prosecution and determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson, 443 U.S. at 319. The standard gives the trier of fact latitude to fairly resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. Id.

The standard does not permit this Court to make its own subjective determination of guilt or innocence, and it does not require scrutiny of the reasoning process actually used by the jury. Id. The standard must be applied with explicit reference to the substantive elements of the criminal offense as defined by state law. Id. at 324 n.16. The California principals of judicial review are consistent with Jackson v. Virginia.

The California standard for judicial review of a criminal conviction, challenging the sufficiency of evidence, compels the appellate court to consider the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence. People v. Johnson, 26 Cal. 3d 557, 578 (1980). Substantial evidence is considered to be "reasonable, credible, and of solid value such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." Id.

A federal habeas petitioner faces a "heavy burden" when challenging the sufficiency of the evidence supporting a state conviction. Juan H. v. Allen, 408 F.3d 1262, 1274

(9th Cir. 2005). AEDPA requires this Court to "apply the standards of <u>Jackson</u> with an additional layer of deference" when a California state court has issued a reasoned decision denying a habeas petitioner's sufficiency of the evidence claim. <u>Id.</u> Therefore, this Court must determine "whether the decision of the California Court of Appeal reflected an unreasonable application of <u>Jackson</u> and <u>Winship</u> to the facts of this case." <u>Id.</u> at 1275.

In affirming the conviction of Petitioner, the California Court of Appeal discussed the uncertainty surrounding the victim's accusations, the evidence of the victim's other dream regarding sexually explicit subjects and the victim's need for additional attention.

With respect to the uncertainty surrounding the victim's accusations, the California Court of Appeal noted that the Child repeatedly and consistently described the molestations to numerous individuals in pretrial disclosures as well as in her testimony. The Court further determined that although she made repeated references to the possibility of the circumstance being a dream, she also made numerous statements affirmatively indicating that the incidents were real and not a dream.

The Court of Appeal took into consideration the fact that the jury could have credited the Child's explanation of being a dream from what she overheard when the Petitioner mentioned to Mother that the Child must have dreamed the incidents. The Jury did not have to give credit to Mother's testimony that Child had referred to the allega-

17

12cv857

tions being a dream in the initial disclosure because of the inconsistency between Mother's preliminary hearing testimony and her ongoing relationship with Petitioner.

In addition, the Court of Appeal took into consideration the prosecution's evidence that the Child could describe physical details of sexual activity that a young child would not normally be expected to know. See People v. Brodit, 61 Cal. App. 4th 1312, 1330 (1998) (reliability of child's statements supported by fact that her "description of the sexual acts showed a knowledge of such matters far beyond the ordinary familiarity of a child her age.") Viewed in a light most favorable to the prosecution, the circumstantial evidence in this case does permit a reasonable fact finder to find the victim's accusations were more than mere speculation because the veracity of her claims of molestation were consistent, unwavering, and sexually detailed. (Doc. No. 9-19, Lodgment No. 6.)

Petitioner also points to the evidence indicating that the Child had viewed sexual material on the computer, the fact that she had a dream about naked boys and that the Child was in need of attention due to the birth of her sister. (Doc. No. 10, Traverse, at pp. 6-7.) It was up to the jury as trier of fact, not the reviewing court, to weigh conflicting evidence, and draw reasonable inferences from the facts. Jackson v. Virginia, 443 U.S. at 319. Under Jackson, the assessment of the credibility of witnesses is generally beyond the scope of review. Schlup v. Delo, 513 U.S. 298, 330, 115 S. Ct. 851 (1995). Thus, under Jackson

the mere existence of sufficient evidence to convict would be determinative of Petitioner's claim.

The California Court of Appeal looked at the circumstantial evidence in the record and determined that the trial court could reasonably have found beyond a reasonable doubt Petitioner was guilty as charged. (Doc. No. 9-19, Lodgment No. 6.) California Supreme Court law has continually held, "under the prevailing standard of review for a sufficiency claim, [the Court] defer[s] to the trier of fact's evaluation of credibility." People v. Richardson, 43 Cal. 4th 959, 1030 (2008) (citing People v. Snow, 30 Cal.4th 43, 66 (2003)). "Moreover, the testimony of a single witness is sufficient for the proof of any fact. Richardson, 43 Cal. 4th at 1030.

This Court has reviewed the evidence presented in the record and determines that Petitioner provides it with no reason to depart from these principles. Therefore, the decision of the California Court of Appeal reflected a reasonable application of Jackson and Winship to the facts of this case. Consequently, the Court RECOMMENDS that Petitioner's claim in this regard be DENIED.

## VI. CONCLUSION

After a review of the record in this matter, the undersigned Magistrate Judge finds that Petitioner has not established a claim for federal habeas corpus relief under the applicable legal standards. Therefore, the Court RECOMMENDS that the Petition be DENIED.

19

12cv857

This Report and Recommendation of the undersigned Magistrate Judge is submitted to the United States District Judge assigned to this case, pursuant to the provision of 28 U.S.C. § 636(b)(1).

**IT IS ORDERED** that *no later than August 16, 2013*, any party may file written objections with the Court and serve a copy on all parties. The document should be captioned "Objections to Report and Recommendation."

**IT IS FURTHER ORDERED** that any reply to the objections shall be filed with the Court and served on all parties *no later than August 30, 2013*. The parties are advised that failure to file objections within the specified time may waive the right to raise those objections on appeal of the Court's order. See Turner v. Duncan, 158 F.3d. 449, 455 (9th Cir. 1998); Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

Date: July 16, 2013

KAREN S. CRAWFORD
United States Magistrate Judge